DECISION
Plaintiff appeals the 2008-09 real market value of improvements identified as Account 05008987 (Tax Lot 2400).
A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on August 29, 2011, and August 31, 2011. Donald Grim, Attorney at Law, appeared on behalf of Plaintiff. Sonya Johnson (Johnson), Plaintiffs Controller and John Taylor (Taylor), broker and certified appraiser, testified on behalf of Plaintiff. Kathleen Rastetter, Senior County Counsel, appeared on behalf of Defendant. Cheryl Gordon (Gordon), MAI, Oregon and Washington certified general appraiser and Clackamas County Staff Appraiser, testified on behalf of Defendant. Parties stipulate that Taylor and Gordon are expert witnesses.
Plaintiffs Exhibits 1, 2, 3, and 8 through 13 were received without objection. Defendant's Exhibits A through K were received without objection.
Defendant's Trial Memorandum, filed August 26, 2011, included a motion in limine. Because Plaintiff did not offer into evidence the exhibits that were the subject of Defendant's motion in limine, Defendant's motion in limine is moot. / / / / / / *Page 2 
 I. STATEMENT OF FACTS
The trial for the above-entitled matter was held at the same time as a related matter, Village at Main Street v. Clackamas CountyAssessor, TC-MD 070501D (Control). Relevant facts for the above-entitled matter can be found in TC-MD 070501D. For the 2008-09 tax year, Plaintiff presented no evidence or testimony; Plaintiff's evidence and testimony set forth in TC-MD 070501D is for tax year 2006-07.
On behalf of Defendant, Gordon testified, stating that her determination of value was based on three approaches to valuation.
A. Cost Approach
Gordon testified that the cost approach "is most applicable when the improvements are new or proposed construction" and "[a]s noted earlier, the date of value of this analysis is January 1, 2008 upon which construction of improvements was complete." (Def's Ex C-40.) Stating that "[t]he subject property includes six units configured in one building," Gordon's appraisal report stated that "[a]ll units are generally uniform in construction and quality. Construction costs for the six units will be estimated from three sources, to include developer reported costs, comparable construction costs and Marshall Swift Valuation Service." (Id.)
Referencing a report entitled VAMS II Combined Lumber — Consolidated, Fixed Asset Subledger, 302 Units/328,270 Sq Ft, December 2005, Gordon testified that "the developer" reported "total direct costs of $17,814,555 for the then-302 units. Subtracting those costs specific to site improvements and site/underground work, results in a building construction cost estimate of $16,299,241" or $53,739 per unit. (Def's Ex A-99; C-40.) When asked if Gordon knew the source of the document or if she had additional information to support the costs stated on that document, Gordon testified that the document was in the "county's files" and she *Page 3 
assumed it came from the developer. Johnson testified that she "could not verify" the "costs are actual." Plaintiff objected to Defendant's Exhibit A-99, stating a lack of foundation.
Gordon testified that she prepared a table setting forth the "construction costs obtained from area developers for [four] similar multifamily developments in the extended Willamette Valley region." (Id. at 40.) Those four comparables were all built in 2007, ranging from 6 to 16 units. (Id. at 41.) Gordon concluded that within the range of $67.35 to $114.94 per square feet, "the cost comparables suggest a direct construction cost of about $100,000 to $140,000 perunit." (Id.) (emphasis in original).)
Gordon also developed a cost per square foot using data from Marshall Swift Valuation Service adjusted for "[a]pplicable Regional and Local multipliers of 1.05 and 1.06. (Id. at 42.) She concluded a "cost estimate of $141,406 per unit." (Id.)
After considering all three cost amounts, Gordon concluded "a total direct cost figure of $140,000 per unit" or "$840,000 for the six units." (Id.)
Gordon testified that to the direct costs there are indirect costs and entrepreneurial incentive that must be considered and added to determine a total cost per unit. She testified that "[b]ased on the data available and market standards, indirect costs of 20.00% of direct construction costs" and an entrepreneurial profit of 15.00% ofdevelopment costs" must be added to direct costs. (Id. at 43, 44) (emphasis in original).) Gordon testified that the subject property was "built to be used as a rental." Gordon concluded that because the property was new there was no "applicable depreciation" to deduct. (Id. at 45.) Her total cost was "$1,159,200 for the six apartment units." (Id.) *Page 4 
B. Comparable Sales Approach
1. Price per unit
Gordon testified that she selected five comparable properties. (Id. at 61.) Those five properties were located in Portland, Gresham, and Vancouver, Washington. The unit size of Gordon's five comparable properties ranged from six units to eight units, resulting in a range of adjusted sale price per unit of $192,163 to $282,800. (Id. at 69) Gordon's appraisal report stated that each of the comparable sales was adjusted for age of construction, quality of construction, average unit size, and garages. (Id. at 68.) She wrote that the "comparables were built from 1996 to 2003 as compared to the subject construction year of 2006. * * * The subject units are considerably larger than the comparables, at 1,572 SF. * * * The subject units are very good quality;" and the subject property offers garages and one of the comparable properties "does not." (Id.) Gordon's appraisal report stated that "[b]ased on the comparables and the age, quality and investor appeal of the subject units, a price per unit indicator of $250,000 is concluded. Applied to the six units results in a price per unit indicator of $1,500,000." (Id. at 69.) (emphasis in original).)
2. Price per square foot
Using five comparable properties, Gordon determined that "the comparables range[d] from $141 to $257 per SF." (Id.) In discussing price per square foot, Gordon's appraisal report stated that "[g]iven the subject's large size, a below-average figure is warranted. A price per SF of $170 per SF is concluded. Applied to the 9,430 SF size results in a value indicator of $1,603,100." (Id.) (emphasis in original).)
Gordon included her Gross Potential Income Multiplier (GPIM) analysis with the Sales Comparable Approach. (Id.) Gordon's appraisal report stated: *Page 5 
 "The comparable sales have generally similar unit mixes to include two and three bedroom single-level units and townhouses. Unit features (patios/decks, washer/dryer machines) are generally similar to the subject. The subject units, however, are new and have high quality finishes and features that are most accurately described as `condominium' level.
 "As such, the subject units earn much higher income than the comparables. The comparables earn average annual gross income of $9,000 to $12,300 as compared t the $22,056 annual figures forecast for the subject units.
 " * * * The comparables indicate a range of GPIMs from 10.22 to 15.83 with an average of 12.92.
 "Based on the comparables, a GPIM of 12.00 is concluded. Applied to the forecast gross potential income of $132,336 results in a value indicator of $1,588,032 for the subject property."
(Id. at 69, 70.)
After considering the price per unit indicator, price per square foot indicator and GPIM indicator, Gordon concluded a real market value of $1,550,000. (Id. at 70.) Gordon testified that she gave the "least weight" to this approach because there were no "true similar sales of property similar to the subject property."
C. Income Approach
Gordon's appraisal report stated that the "owner provided historic income and expense statements for 2006, 2007, 2008 and 2009." (Id. at 47.) She concluded that "[a]lthough income and expenses are from 2009, these figures are the most reasonable indication of stabilized operating expenses." (Id.) Gordon undertook a rent survey using five comparable properties "located within very close proximity of the subject property. (Id. at 53.) She included the following apartment complexes in her study: Madison Boulder Creek Apartments, Canyon Creek Apartments, Town Center Park Apartments, Hathaway Court Apartments, and Wilsonville Summit (Id. at 48.) Gordon compared actual effective rate for each unit, specifically type and size (two bedroom and two bathroom, measuring 1,405 square feet; two bedroom and two *Page 6 
bathroom, measuring 1,423 square feet; and three bedroom and three bathroom, measuring 1,887 square feet) to the "owner's projected average `street rate.'" (Id. at 55.) Based on that comparison, Gordon determined "forecast market rents" for the six units." (Id.) Gordon forecast other income consisting of fees, deposits, utility reimbursements, and undefined miscellaneous to be $526 per month per unit. (Id.)
In determining a vacancy and collection loss deduction, Gordon considered information reported by "competing properties, * * * local brokerage publications, and investor parameters." (Id.) Gordon noted that "[f]or a property of such small size, just one vacant unit equates to 17%" vacancy factor. (Id. at 56.) "Based on small size and high-end caliber, a 10.00% vacancy and collection loss is applied to the gross potential income." (Id.)
Gordon relied on the "owner's reported expenses for 2009" in computing operating expenses because "this reporting period [2009] best reflect stabilized expenses for the subject property." (Id. at 57.) In her appraisal report, Gordon stated that "[f]orecast expenses total $27,294 or 20.63% of gross potential income. Forecast expenses are generally similar as reported by the owner." (Id. at 58.) After deducting vacancy and operating expenses, Gordon computed a net operating income of $91,808. (Id.)
To the net operating income, Gordon applied an overall capitalization rate. She described that capitalization rate as "a `loaded' market rate which is based upon the applicable tax code and change ratio." (Id.) Gordon used the same five comparable sales that were selected for her "Sales Comparison Approach." (Id.) "The five sales establish an OAR range of 4.42% to 6.24% with an average of 5.25%." (Id.) Noting that "[t]he subject property is new construction, has above average amenities and is well-located," Gordon concluded that a "market OAR of 5.00% is a reasonable rate for the subject property." (Id.) (emphasis in original).) To the five percent *Page 7 
capitalization rate, Gordon added "the applicable 2008 tax code rate of 1.80039 multiplied by "the change ratio adjustment to the date of value, or 0.670" or a property tax rate of 1.20626. (Id.) Gordon concluded that the "loaded OAR" was "6.2063%." (Id. at 59.)
Gordon's appraisal report stated:
 "Dividing the estimated net operating income of $91,808 by 6.2063% results in a value indication of $1,479,282 rounded to $1,480,000."
(Id.) (emphasis in original).)
D. Reconciliation
Gordon testified that after determining real market value using the "three most applicable methods to valuation," the "three indicators vary by eight percent." (Id. at 71.) She concluded that because the subject property was "an income-producing property and is marketable separately from the adjacent phases, the Income Capitalization Approach is the most applicable method of valuation" and "primary weight is assigned to the Income Capitalization Approach." (Id.) Gordon concluded an improvement real market value as of January 1, 2008, of $1,050,000. (Id.)
 II. ANALYSIS
The issue before the court is the 2008-09 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. SeeRichardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [1] which reads: *Page 8 
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm'-length transaction occurring as of the assessment date for the tax year."
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2) and OAR 150-308.205-(A)(2).
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. ofRev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property."Poddar v. Dept. of Rev., 18 OTR 324, 332 (2005) (quotingWoods v. Dept. of Rev., 16 OTR 56, 59 (2002) (citation omitted). Plaintiff provided no evidence of the subject property's real market value as of the assessment date, January 1, 2008.
Even though Plaintiff failed to carry its burden of proof and to then shift that burden to Defendant, this court "has jurisdiction to determine the real market value or correct valuation [of property] on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant's expert witness, Gordon, determined an improvement real market value using the three valuation approaches: cost, sales and income. Gordon concluded that primary weight should be given to the income approach and the court agrees that, because the subject property is an income producing property, the most applicable approach is / / / *Page 9 
the income capitalization approach. The court concludes that Gordon's capitalization rate is on the low end of the applicable range, resulting in a overstatement of real market value.
To determine an improvement real market value, Gordon deducted the land real market value of $450,000. (Id. at C-iii) In the court's Decision for TC-MD 070501D, the court concluded that the land real market value of the subject property is $473,000.
After adjusting the land real market value and the capitalization rate, the court concludes that the improvement real market value as of January 1, 2008, is $1,000,000.
The improvement real market value determined by the court is greater than the improvement real market value ($832,320) stated on the Clackamas County Board of Property Tax Appeals Order, dated April 1, 2009. The result is that there will be no change in Plaintiffs property taxes for tax year 2008-09 as a result of the court's determination.
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court's determination of the subject property's real market value is based on Defendant's testimony and written evidence adjusted as noted above. Now, therefore, *Page 10 
IT IS THE DECISION OF THIS COURT that, because the court's determination of improvement real market value results in no change to Plaintiffs 2008-09 property tax assessment, Plaintiffs appeal is denied.
Dated this ____ day of December 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron
 December 13, 2011. The Court filed and entered this documenton December 13, 2011.
[1] All references to the Oregon Revised Statutes (ORS) are to year 2007.